# UNITED STATES DISTRICT COURT
### for the
### District of Columbia

In the Matter of the Search of     )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*    )    Case No. 22-sw-72
   3002 RODMAN STREET NW #302     )
   WASHINGTON, DC 20008     )
   UNDER RULE 41     )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

     I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

   See Attachment A, incorporated herein.

located in the _____ District of _____ Columbia _____ , there is now concealed *(identify the person or describe the property to be seized)*:

   See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

   ☑ evidence of a crime;

   ☑ contraband, fruits of crime, or other items illegally possessed;

   ☑ property designed for use, intended for use, or used in committing a crime;

   ❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841 and 846 | Conspiracy to Distribute and Possession With Intent to Distribute Controlled Substances |

The application is based on these facts:

   See Attached Affidavit in support of Search Warrant, which is incorporated herein by reference.

   ❏ Continued on the attached sheet.

   ❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under
     18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Lorenzo James, Senior Police Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: _____ 03/22/2022 _____

*Judge's signature*

City and state: __ District of Columbia __     Zia M. Faruqui, United States Magistrate Judge
*Printed name and title*

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means                    ☑ Original                    ❑ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>3002 RODMAN STREET NW #302<br>WASHINGTON, DC 20008<br>UNDER RULE 41 | )<br>)<br>)<br>)<br>)<br>)<br>)   Case No.  22-sw-72 |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____Columbia_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A, incorporated herein.


I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.


**YOU ARE COMMANDED** to execute this warrant on or before _____April 5, 2022_____ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Zia M. Faruqui_____ .
                                        *(United States Magistrate Judge)*

❑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
❑ for _____ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:   _____03/22/2022_____               _____
                                                                                    *Judge's signature*

City and state:         _____District of Columbia_____        Zia M. Faruqui, United States Magistrate Judge
                                                                                    *Printed name and title*

AO 93C  (08/18) Warrant by Telephone or Other Reliable Electronic Means (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>  22-sw-72 | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

The property to be searched is 3002 RODMAN STREET NW #302 (TARGET LOCATION). The residence is described as a multi-unit apartment building. The numerals 3002 are affixed to a glass panel above the front main entrance door to the apartment building. To the right of the main entrance door, affixed to the wall, is a ceramic plaque with the apartment name affixed to it (THE RODMAN). The target apartment, #302, is located on the third floor. The door leading to apartment #302 is beige in color with the numerals 302 affixed to it. This apartment has an outer shutter, beige security door, with the numerals 302 affixed to it.

## ATTACHMENT B

*Property to be seized*

1.     The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 21 U.S.C. §§ 841 (Distribution of Controlled Substances) and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances) (hereinafter the "TARGET OFFENSES"), that have been committed by Shameka HAYES and Sheldon MARBLEY a/k/a "Shelton" (hereinafter the "SUBJECTS") and other identified and unidentified persons, as described in the search warrant affidavit, including, but not limited to:

   a.   Drugs and drug paraphernalia, and items used in the sale, transfer, transportation, packaging of illegal narcotics substances, and also including scales, butcher paper, boots, plastic wrap, plastic bags, tape, cigarette papers, pipes, hypodermic needles and syringes, written articles on the use and effects of narcotics, diluents and cutting agents, which is evidence of the TARGET OFFENSES.

   b.   Documents related to or memorializing the ordering, purchasing, storage, transportation and sale of controlled substances, including U.S. currency used in the purchase and sale of controlled substances, buyer lists, seller lists, pay-owe sheets and records of sales, log books, drug ledgers, personal telephone/address books of customers and suppliers, rolodexes, telephone answering pads, bank and financial records, records relating to domestic and foreign travel such as tickets, passports, visas, credit card receipts, travel schedules, receipts and records, trucker log books and storage records, such as storage locker receipts and safety deposit box rental records, which is evidence of the TARGET OFFENSES, proceeds of the TARGET OFFENSES, and contain evidence of the TARGET OFFENSES.

   c.   Books, records, receipts, notes and other papers relating to the transportation, ordering, purchase, and distribution of controlled substances and the transportation, ordering, purchase and transfer of firearms and ammunition, which is evidence of the TARGET OFFENSES.

d. Address and/or telephone books and papers reflecting names, addresses and/or telephone numbers, which constitute evidence of customers, distributors, conspirators, and potential witnesses of the TARGET OFFENSES;

e. Evidence of any conspiracy, planning, or preparation to commit the TARGET OFFENSES;

f. Evidence concerning efforts after the fact to conceal evidence of the TARGET OFFENSES, or to flee prosecution for the same;

g. Books, records, receipts, bank statements, money drafts, currency, letters of credit, money orders and cashier's checks, passbooks, bank checks, safe deposit box keys, and any other items evidencing the obtaining, secreting, transfer, concealment, storage and/or expenditure of money, which constitute records and proceeds of the TARGET OFFENSES;

h. Photographs, and videos, in particular photographs of co-conspirators and firearms, which constitute evidence of the TARGET OFFENSES;

i. Safes, both combination and key type, the keys associated with such locking containers, and their contents, which can contain evidence of the commission of the target offense or proceeds from the commission of the TARGET OFFENSES;

j. Indicia of ownership, including, receipts, invoices, bills, canceled envelopes and keys, which provides evidence of identity;

k. Records and information that constitute evidence of the state of mind of the SUBJECTS, and other co-conspirators *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

l. Records and information that constitute evidence concerning persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the SUBJECTS about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

m. Clothing, shoes, and related property worn by the SUBJECTS and other co-conspirators during the commission of the TARGET OFFENSES.

2. Digital devices used in the commission of, or to facilitate, violations of the

TARGET OFFENSES.

3.      For any digital device which is capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

a.  evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b.  evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.  evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d.  evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e.  evidence of the times the Device(s) was used;

f.  passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g.  documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h.  records of or information about Internet Protocol addresses used by the Device(s);

i.  records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses; and

j.  evidence pertaining to the commission of the TARGET OFFENSES, including but not limited to photographs, text messages, telephone calls, audio communications, email communications, and videos.

4.      Routers, modems, and network equipment used to connect computers to the Internet.

5.      As used above, the terms "records" and "information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

6.      The term "digital devices" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); security devices; and any other type of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions.

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

**IN THE MATTER OF THE SEARCH OF:**

**3002 RODMAN STREET NW #302
WASHINGTON, DC 20008
UNDER RULE 41**

Case No. 22-sw-72

*Reference:     USAO Ref. # 2022R00199; Subject Address:  3002 Rodman Street NW, #302
Washington, DC 20008*

**AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
FOR A WARRANT TO SEARCH AND SEIZE**

I, Lorenzo James, a Senior Police Officer with the Metropolitan Police Department of
Washington, D.C.  (hereinafter, "affiant") being duly sworn, deposes and states as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules
of Criminal Procedure for a warrant to search a residence located at 3002 Rodman Street NW,
#302, Washington, DC 20008 (hereinafter "TARGET LOCATION"), further described in
Attachment A, for the items described in Attachment B.

2.     Your affiant is "an investigative or law enforcement officer" of the United States
within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the
United States who is empowered by law to conduct investigations of and to make arrests for
offenses enumerated in Section 2516 of Title 18, United States Code.

1.     I am a Senior Police Officer with the Washington, D.C. Metropolitan Police
Department (MPD). I have been in this position since September 28, 2020. Prior to this, I was an
Officer who then got promoted to the rank of Detective Grade II with MPD for 30 years. I retired
after serving as a member of the police department for 30 years. I am currently assigned to the

MPD Violent Crime Suppression Division (VCSD) (Overdose Unit) as the liaison officer for all suspected overdoses that have occurred in the District of Columbia or may have emanated from the District of Columbia. My work has focused on investigating fatal and non-fatal overdose deaths in the District of Columbia and targeting the supplier who caused the overdose.

2.       During the course of my work as a Detective, and currently a Senior Police Officer investigating narcotics and firearms related offenses, I have participated in the searches of numerous premises, vehicles and individuals which have led to the recovery of contraband, and evidence, including firearms, narcotics, and digital devices. In addition, I regularly work with confidential informants who provide information about individuals involved in drug, gun trafficking and human trafficking and have become familiar with the ways that drugs are sold on the streets of Washington, DC. When speaking to informants, I have learned how cell phones and other digital devices are regularly used to arrange and coordinate the sale of drugs (including coordinating with suppliers and purchases of the product). Because cell phones contain digital records of these relationships and communications, including text messages, digital devices can contain a great deal of information regarding a drug trafficker's business.

3.       Through my investigations, as well through consultation with other law enforcement personnel, I have also become familiar with the manner and methods by which narcotic traffickers conduct their drug trafficking operations, including the methods and techniques associated with the distribution of narcotics, the organization of drug conspiracies, and the unlawful possession and trafficking of narcotics. Through my experience, I am also aware that narcotic traffickers often possess firearms to assist them in the trafficking of narcotics.

4.       Based on my training, experience, and participation in other narcotics investigations, I know that narcotic traffickers maintain books, records, receipts, notes, ledgers, and other papers

relating to the transportation, ordering, sale and distribution of controlled substances.  Furthermore, I know that the aforementioned books, records, receipts, notes, ledgers, and other papers, etc., are generally maintained where the traffickers have ready access to them.

3.  It is common for significant dealers to secrete contraband, proceeds of drugs sales, and records of drug transactions in secure locations within their residences, their place of employment, the residences of their associates and paramours, and automobiles for ready access and to conceal same from law enforcement authorities.

4.  Furthermore, your affiant knows that with the technological advances in society today, drug dealers utilize electronic equipment such as cellular telephones, computers, facsimile machines, pagers, telex machines and telephone answering machines to further facilitate their illicit transactions.

5.  Based on my training and experience, I know that individuals involved in criminal activities will often communicate with their associates before, during, or after the crime by using cellular telephones and that communication can be made through either verbal conversation, third party communication applications, or through the use of text messages between the two communicating parties' cellular telephones or other devices.  I also know that to facilitate drug trafficking, narcotics will be kept and stored in a discreet location.

6.  The information set forth in this affidavit is based on my personal observations and investigations, my experience and background as a Senior Police Officer with MPD, and information provided directly or indirectly by other law enforcement officers, Undercover Employees/Officers (UCE), and Confidential Human Sources (CHS).  Unless otherwise noted, whenever this affidavit asserts that a statement was made, it was an instance in which the information was provided by another law enforcement officer (who may have had either direct

or hearsay knowledge of the statement).  The information contained herein may not always set forth my personal observations, but rather, may represent information provided by other law enforcement officers who conducted such investigation.

7.     Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 21 U.S.C. §§ 841 (Distribution of Controlled Substances) and 846 (Conspiracy to Possess with Intent to Distribute Controlled Substances) (hereinafter the "TARGET OFFENSES"), have been committed by Shameka HAYES and Sheldon MARBLEY a/k/a "Shelton" (hereinafter the "SUBJECTS") and other identified and unidentified persons. There is also probable cause to search TARGET LOCATION for the items described in Attachment B.

## **INTRODUCTION**

8.     On January 28, 2022, multiple drug overdoses (both lethal and nonlethal) occurred within Washington D.C., all within a few hours of one another. After gathering evidence (which included witness interviews, evidence recovered from the overdose scenes, CCTV video, cell-site data, and MPD Body Worn Camera from officers responding to the overdose victims), MPD identified Shameka HAYES and Sheldon MARBLEY a/k/a "Shelton" as the distributors of the drugs from which multiple victims overdosed.

9.     A review of CCTV footage from the same day of the overdoses, near the area of the overdoses, reveals that HAYES and MARBLEY were located in a Mazda engaging in several suspected drug sales with several of the victims shortly before they died. By comparing Body Worn Camera footage of the overdose investigations with CCTV footage from the area where narcotics sales were taking place, MPD identified six overdose victims who all walked up to a

Mazda containing HAYES and MARBLEY and appeared to purchase narcotics shortly before each of their overdoses.

10.     From the scene of several overdoses, MPD seized several capsules containing either drugs or drug residue. Preliminary testing of some of these capsules yielded positive results for cocaine and butyrl fentanyl, which is a fentanyl analogue. DEA lab analysis of four of these capsules confirmed the presence of cocaine and identified the fentanyl analogue as Para-Flurofentanyl.

11.     Two of the overdose victims who suffered non-fatal overdoses, explained that they traveled to Half and O Street on January 28, 2022, to purchase what they believed was crack cocaine from two individuals, both a man and a woman, who they had been purchasing crack cocaine from for months. When shown pictures of the two individuals, both victims identified HAYES and MARBLEY as the individuals who regularly sold them drugs and sold them the drugs on the day in question.[1] Both victims described that on January 28, 2022, the drugs they purchased were packaged differently from the ones they usually purchased, this time in capsules. These capsules are similar to the capsules found on the scene of several other overdose victims that day, some of which contained cocaine, butyrl fentanyl, and Para-Flurofentanyl.

12.     Law enforcement obtained warrants, signed by U.S. Magistrate Judge Faruqui for cell-site location data (22-sc-582 on March 4, 2022) and a cell-site simulator (22-sc-651 on March 9, 2022 for phones subscribed to HAYES. The investigation has revealed that HAYES has several phones subscribed in her name. The investigation also revealed that shortly after the

---

[1] When one of the victims was shown a photograph of HAYES, the victim first said, "Yeah, looks like her." When asked how confident the victim was, the victim responded, "not too sure." Nonetheless, the Mazda from which HAYES and MARBLEY were dealing is registered to HAYES. In addition, cell-site data for a cell-phone subscribed in HAYES' name is hitting cell towers consistent with the location of the Mazda on the day in question.

multiple overdoses occurred on January 28th, HAYES stopped using two phones previously subscribed to her and started using new phones that were the subject of search warrant 22-sc-582.

13.   On March 22, 2022, a federal grand jury indicted both HAYES and MARBLEY in a three-count indictment (22-cr-93-CRC), charging them with conspiracy to distribute cocaine and Para-Flurofentanyl; distribution of cocaine and Para-Flurofentanyl to a male victim, causing substantial bodily injury; and distribution of cocaine and Para-Flurofentanyl to a female victim, causing substantial bodily injury. The same day, U.S. Magistrate Judge Faruqui issued warrants for each defendant's arrest.

14.   On the evening of March 21st and the morning of March 22nd, MPD was using the court-authorized cell-site simulator to track a phone subscribed in HAYES' name. The cell-site simulator location information indicated that that the phone was located within an apartment building at 3002 Rodman Street NW, #302, Washington, DC 20008.[2] On March 22nd, MPD stationed itself on each floor of the apartment building in an attempt to determine which apartment HAYES and MARBLEY were located in an effort to execute their arrest warrants. At approximately 6:30 a.m., MPD was located on the 3rd floor when they heard sounds coming from unit 302 (TARGET LOCATION) on that floor.  Unit 302 is the only apartment on that corridor.  Shortly thereafter, HAYES and MARBLEY both came from the same corridor where TARGET LOCATION is located and walked down the hallway.  MPD immediately recognized HAYES and MARBLEY and detained them without incident. MPD asked HAYES what apartment she came from and she replied "that one" referring to TARGET LOCATION.  Both

---

[2] Since obtaining the cell-site simulator on March 9th, the phone's location is consistent with residing at the TARGET LOCATION the majority of the time, including evenings.

HAYES and MARBLEY were then placed under arrest and taken to the Homicide Branch to be interviewed. While waiting for the transport to the Homicide branch, MARBLEY gave TARGET LOCATION as his address and asked if members would give him clothing from inside of the apartment.

15.     While clearing the apartment to ensure there were no other subjects inside, MPD encountered a male individual who appears to be under the influence of narcotics. When MPD asked if they could speak with this individual, he indicated that he did not wish to speak to them and he immediately went back to sleep.  During MPD's protective sweep of the TARGET LOCATION, MPD observed in plain view a digital scale in the bathroom window sill, as well as Pink UGG boots and a blue Helley Hansen coat that matched what HAYES was wearing on the date of the overdoses. In addition, while in the apartment getting clothes for MARBLEY, MPD observed, in plain view, inside of the bedroom closet, a plate with a plastic baggie on top, which appear to be narcotics and narcotics paraphernalia.

16.     The TARGET LOCATION has now been secured by MPD. Your affiant is seeking an emergency search warrant for TARGET LOCATION for the items further described in Attachment B.

**Probable Cause as to Digital Devices**

5.     The property to be searched includes, but is not limited to, digital devices associated with the SUBJECTS and the TARGET OFFENSES, hereinafter the Device(s).

6.     It is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 97% of Americans owned at least one cellular phone, and that that same 2019 report

estimated that 85 percent of Americans use at least one smartphone. *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

7.       In addition, in my training and experience, it is common for individuals to back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss.  Indeed, some companies provide services that seamlessly sync data across devices, such as Apple devices and the Apple iCloud service.  Thus, there is reason to believe that evidence of the offense that originally resided on the SUBJECTS phones may also be saved to other digital devices within the TARGET LOCATION.

8.       You affiant has reason to believe that Device(s) may currently be located at the TARGET LOCATION because HAYES indicated that she had come from the TARGET LOCATION and HAYES has multiple phones subscribed in her name—at least two of which she stopped using since the overdoses occured. Your affiant knows individuals who engage in the possession and distribution of controlled substances frequently use multiple phones.  They do this for many reasons, including but not limited to, keeping in contact with different customers using different phones, to keep their personal affairs separated from the illegal acts, as a way to deceive law enforcement by keeping multiple devices in different locations, and so one, or more, phones can be discarded with losing a large amount of information.

9.       Toll records for phones subscribed to HAYES indicate that she communicated with several of the victims in this case.

## **TECHNICAL TERMS**

10.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Digital device," as used herein, includes the following three terms and their respective definitions:

1)      A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030I(1). Computers are physical units of equipment that perform information processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2)      "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3)      "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

c.      A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touch-screen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

d.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location,

and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.      "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

f.      "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

g.      Internet Protocol ("IP") Address is a unique numeric address used by digital

devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

      h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

      i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a user name or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

      j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the

Internet.

k.     A "router" often serves as a wireless Internet access point for a single or multiple devices, and directs traffic between computers connected to a network (whether by wire or wirelessly). A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf. The router also distributes to the relevant client inbound traffic arriving from the Internet. A router usually retains logs for any devices using that router for Internet connectivity. Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address. For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32. Domain names are typically strings of alphanumeric characters, with each level delimited by a period. Each level, read backwards – from right to left – further identifies parts of an organization. Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations. Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice. Additional levels may exist as needed until each machine is uniquely identifiable. For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.

In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software.  A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network.  A P2P file transfer is assisted by reference to the IP addresses of computers on the network:  an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers.   One aspect of P2P file sharing is that multiple files may be downloaded at the same time.  Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

        i.       When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

        ii.      Third party software is available to identify the IP address of a P2P computer that is sending a file.  Such software monitors and logs Internet and local network traffic.

        o.     "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a wide area network (WAN) link between the sites. From a user perspective, the extended network

resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

> p.    "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, is able to decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

> q.    "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

11.    As described above, and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found in TARGET LOCATION, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers;

personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found in the TARGET LOCATION, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a.      Individuals who engage in criminal activity, including possessing with the intent to distribute controlled substances, use digital devices, like the Device(s), to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts; stolen financial and personal identification data, including bank account numbers, credit card numbers, and names, addresses, telephone numbers, and social security numbers of other individuals; and records of illegal transactions using stolen financial and personal identification data, to, among other things, (1) keep track of co-conspirator's contact information; (2) keep a record of illegal

transactions for future reference; (3) keep an accounting of illegal proceeds for purposes of, among other things, splitting those proceeds with co-conspirators; and (4) store stolen data for future exploitation.

b.        Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c.        Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache."  The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital

device depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

12.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when. Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

          a.   Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole. Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes on a digital device were recently used. Web browsers, e-mail programs, and chat programs often

store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

b.   Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.   A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed

along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.   I know that when an individual uses a digital device to illegally possess, traffic in, or distribute controlled substances, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime. The digital device is an instrumentality of the crime because it is used as a means of committing the criminal offense. The digital device is also likely to be a storage medium for evidence of crime. From my training and experience, I believe that a digital device used to commit a crime of this type may contain data that is evidence of how the digital device was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

13.   Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

a.      Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often-requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b.      Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.      Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence

of the absence of particular data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

    d.   Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography."  For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.

A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

        e.      Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f.      Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and

misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

14.     The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the TARGET LOCATION.

15.     Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

g.   Upon securing the TARGET LOCATION, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined in Attachment A, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at TARGET LOCATION. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

h.   The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

i.   In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

16.   Law enforcement personnel will commence the execution of this search and seizure warrant upon the TARGET LOCATION during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as practicable.

17.   From my training and experience, I know that imaging or copying information from digital devices can be substantially delayed by various factors which cannot be ascertained or

sometimes even anticipated until the actual execution of the warrant.  There may, for example, terabytes or even petabytes of information to be copied.  The configuration of the Device(s) may affect and delay data transfer speeds.  Data encryption and password protections may also significantly delay imaging or copying as law enforcement personnel seek to identify necessary passwords without which imaging or copying within only daytime hours would likely be unachievable.  Under some circumstances, data downloads can be interrupted by network or hardware malfunctions or other network or hardware attributes which often necessitates restarting the data downloads from the beginning.

18.     For all of the foregoing reasons, I respectfully submit that good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the search warrant as to the Device(s) at any time of the day or night.  Law enforcement personnel will commence executing the warrant as near to 6:00 a.m. as practicable.  However, given the myriad factors that that may prevent completion of the search and seizure by 10:00 p.m., including those described above, I request authorization to continue the warrant execution past 10:00 p.m., if necessary, until completion of the warrant execution.  Suspending the execution at 10:00 p.m. until 6:00 a.m. could compromise data downloads in progress, render stored data subject to alteration or deletion, and prolong the disruption of access to, and use of, the TARGET LOCATION and the digital devices being searched.

### BIOMETRIC ACCESS TO DEVICE(S)

19.     This warrant permits law enforcement agents to obtain from the person of MARBLEY or HAYES (but not any other individuals present at **TARGET LOCATION** at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s)

requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

20.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners, facial recognition features, and iris recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

21.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

22.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face. For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face. The device's front-facing camera then analyzes and records data based on the user's facial characteristics. The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.

Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

23.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises. For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

24.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

25.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices, the Device(s), will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

26.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48 hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

27.     Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the TARGET LOCATION; (2) hold the Device(s) found at the TARGET LOCATION in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device(s) found at the TARGET LOCATION in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

28.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s). Nor does the proposed warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

## **CONCLUSION**

29.     I submit that this affidavit supports probable cause for a warrant to search the

TARGET LOCATION, as described in Attachment A, and to seize the items described in

Attachment B.

Respectfully submitted,

Lorenzo James
Metropolitan Police Department
Senior Police Officer

Subscribed and sworn pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on March 22, 2022.

_____
HONORABLE ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE